UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

RANDIE R. BOWEN,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        No. 2:09 CV 39 DDN
                                    )
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
            Defendant.              )

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Randie R. Bowen for disability insurance benefits under Title II and for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 401, <u>et seq.</u>  The parties have agreed to the exercise of plenary authority by the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  (Doc. 8.)  For the reasons set forth below, the decision of the Commissioner is reversed and remanded.

## I.  BACKGROUND

Plaintiff Randie Bowen was born on August 30, 1962.  (Tr. 42.)  She is 5'9" tall, with a weight that has ranged from 243 pounds to 264 pounds.  (Tr. 35, 275.)  She completed the 10th grade, and later earned a G.E.D. certificate.  (Tr. 43.)  She is widowed, and has two teenage children.  (Tr. 53.)  She last worked as a candle maker and cashier for a retail store in 2006.  (Tr. 151.)

On November 21, 2006, Bowen applied for disability insurance benefits and supplemental security income, alleging she became disabled on September 27, 2006, due to osteoarthritis and allied disorders.  (Tr. 89-90, 124.)  She received a notice of disapproved claims on March 21, 2007.  (Tr. 92-96.)

After a hearing on June 24, 2008, the ALJ denied benefits on November 7, 2008. (Tr. 19-29, 39-88.) On May 27, 2009, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II.  ADMINISTRATIVE RECORD

Bowen earned income, though somewhat sporadically, from 1978 to 2006. Between 1978 and 1985, she earned between $1,127.75 and $4,850.72 a year. In 1986, she earned $10,690.05, and in 1987, she earned $9,075.92, her two highest earning years. Between 1988 and 1996, her earnings ranged from a few hundred dollars (1991, 1995, 1996) to a few thousand dollars (1988-90 and 1993-94). She had no earnings in 1992. From 1997 to 2006, she earned between $5,985.96 and $8,711.14 a year. (Tr. 139.)

Bowen completed a disability report. Her arthritis, bad knees, anxiety, and bad back limited her ability to work. She could not sit or stand for more than an hour and was in constant pain. It was hard for her to get up and move around, and she had anxiety attacks when she was around people. Her impairments first interfered with her ability to work in 1983, but she did not become unable to work until September 27, 2006, her last day of work. Bowen stopped working because she was fired. (Tr. 149-65.) She had worked as a candle maker and cashier for a retail store from 1998 until she was fired in 2006. As part of the job, she lifted slabs of wax that weighed up to thirty pounds. Before that, she worked as a cashier at a convenience store from 1980 until 1999. Before that, she worked as a waitress at a restaurant from 1975 until 1982. (Tr. 175-82.)

Bowen's pharmacy records from January 1, 2004, to May 16, 2008, show she was taking Acetaminophen, Citalopram, Clonazepam, Codeine, Guaifenex, Hydrocodone, Piroxicam, Propoxyphene, Ranitidine, Seroquel,

Tramadol, and Tussionex.[1]  Dr. Tucker, Dr. Bieniek, and Nurse Daniel-Rice prescribed most of these drugs.  (Tr. 195-99.)

On June 19, 2006, Charles Stricker, M.D., reviewed an x-ray of Bowen's chest and ribs.  The x-ray showed no evidence of any acute cardiopulmonary disease, but revealed thin opacities in the left lung base likely representing atelectasis.[2]  Dr. Stricker also suspected old compression fractures in the thoracolumbar junction of the spine.  The x-ray of the ribs revealed a mildly displaced fracture of the very distal left eighth and ninth ribs with smooth deformity.  (Tr. 238-39.)

On August 5, 2006, Bowen went to the hospital a week after being involved in a car accident while in the front passenger seat.  The record from the emergency room shows she was alert with no evidence of head trauma.  Her neck was non-tender.  (Tr. 230-32.)

On August 5, 2006, Raul Martin, M.D., reviewed x-rays of Bowen's chest, knees, and ribs.  The chest x-ray showed the lungs were clear and well-inflated with no acute cardiopulmonary process in the chest.  The knee x-ray showed no evidence of any acute fractures, dislocations, or effusion in the knee.  There was some narrowing of the joint spaces in the medial compartments, as well as calcification of cartilage around the meniscus.  The x-ray of the ribs showed a minimally displaced fracture of the eighth rib.  (Tr. 233-34.)

---

[1]Acetaminophen, or Tylenol, is used to treat mild to moderate pain. Citalopram is an anti-depressant used to treat depression.  Clonazepam is used to treat seizure disorders and panic attacks.  Codeine and Propoxyphene are narcotic pain relievers, used to treat mild to moderate pain.  Guaifenex is used to relieve coughs caused by the common cold, bronchitis, or breathing illnesses.  Hydrocodone is a narcotic pain reliever, used for short periods of time, to treat moderate to severe pain.  Piroxicam is an anti-inflammatory drug, used to reduce pain, swelling, and joint stiffness from arthritis.  Ranitidine is used to treat stomach ulcers.  Seroquel is used to treat certain mental or mood conditions, such as bipolar disorder or schizophrenia.  Tramadol is used to relieve moderate pain.  Tussionex is used to treat coughs and other symptoms caused by the common cold or allergies.  WebMD, http://www.webmd.com/drugs (last visited June 9, 2010).

[2]Atelectasis is the absence of gas from the lungs due to failure of expansion or resorption of gas.  Stedman's Medical Dictionary, 147 (25th ed., Williams & Wilkins 1990).

On January 17, 2007, Bowen completed a function report. In a typical day, she cleaned and straightened her home, and took care of her two daughters. Her 15-year old daughter usually stayed with her father, but her 12-year old daughter was with her all the time. Bowen tried to look for a job where she could alternate sitting and standing, because she could not bend her knees or kneel. Bowen was able to cook, clean, dust, and wash clothes, but only for small periods at a time. She also cared for a cat, though her daughter helped with the chores Bowen could not do. Bowen was able to care for her personal needs, but it took longer than before. Bowen prepared food daily, but it was simple fare. She went outside twice a week, but did not have a car. She spent time with friends "all the time," talking, watching movies, and playing cards. She did not have any problems getting along with family, friends, or authority figures, though she had been fired from one job because of attitude problems. She suffered from anxiety and panic attacks, which seemed to get worse with age. Bowen sometimes walked with a cane or walker when her arthritis was particularly bad. In the remarks, Bowen noted that she could not afford to see a rheumatologist. She had been told she might be bipolar, and she noted that things were becoming a chore to do, and that she was getting depressed. (Tr. 166-73.)

On March 10, 2007, Bowen saw Raymond Leung, M.D., at the West Park Medical Clinic, complaining of arthritis in her back, knees, hands, and shoulders. She noted having gripping problems with her left hand. A physical examination showed that Bowen was obese, but in no apparent distress. Her speech, hearing, and understanding were within normal limits. Dr. Leung found Bowen uncooperative during the exam, and noted she was irritable. When Dr. Leung asked her to do things, "she repeatedly would say 'I can't.'" A musculoskeletal exam showed Bowen walked with a minimal limp. She refused to walk on her heels and toes. She did not want Dr. Leung to test her right knee reflexes. She was able to get up and down in her chair without difficulties. Dr. Leung did not complete the musculoskeletal exam because Bowen was uncooperative. He estimated her motor and grip strength to be 4/5. Dr.

Leung diagnosed her with arthritis, but noted she was not cooperative during the exam.  (Tr. 240-41.)

On April 4, 2007, Bowen completed a disability report.  She noted being very depressed, and spending a lot of time sleeping.  She was very anxious and struggled to keep from being isolated.  Her hygiene tended to slide when she was depressed.  (Tr. 183-90.)

On April 12, 2007, Shirley Hunt, a caseworker, completed a physician's certification/disability evaluation for the Missouri Department of Social Services.  Hunt noted that Bowen had been expressing anxiety about being in public recently, and that her relationships were causing her to withdraw.  She had a depressed mood and loss of energy, and Hunt diagnosed her with major depression, generalized anxiety disorder, and alcohol dependence in remission.  Hunt believed Bowen's impairments would prevent her from working for six to twelve months.  (Tr. 242-43.)

On April 12, 2007, the Marion County Family Support Division referred Bowen to Jerry Aamoth, M.S., a licensed psychologist.  Bowen had taken public transportation to the consultation.  Bowen had lost forty pounds during the last three years, and was proud of the accomplishment.  At the time of the visit, Bowen was only taking Aleve for her arthritis; she was not taking any other medication.[3]  She had taken anti-depressants in the past, but stopped taking them after they made her tired while she was working.  A mental status examination showed Bowen's mood was depressed with a labile affect.[4]  She had an underlying sense of anxiety, with pressure of speech and rapid thoughts. There was no sign of any delusions or hallucinations, but she had racing thoughts and sleep disturbance.  She reported a history of depression, anxiety, and gradual withdrawal.  She completed alcohol rehabilitation programs in the mid-1990s, but did not stop drinking until 2003.  Bowen

---

[3]Aleve is used to relieve mild to moderate pain from various conditions.  It can reduce the pain, swelling, and joint stiffness caused by arthritis.  WebMD, http://www.webmd.com/drugs (last visited June 9, 2010).

[4]A labile affect is characterized by free and uncontrolled expression of the emotions.  Stedman's Medical Dictionary, 831.

noted being involved in church, and praying for her recovery. She believed she was unable to work primarily because of her arthritis, but also because of her depression and anxiety. Aamoth diagnosed her with recurrent and moderate major depression, generalized anxiety disorder, alcohol dependence in remission, and assigned her a GAF score of 60.[5] Aamoth believed Bowen's functional limitations appeared to be her weariness of relationships, being too close to people, and her skepticism about the future. She exhibited a loss of energy and a gradual withdrawal pattern. Aamoth believed these impairments "should be treatable with medications and counseling but until this is implemented, she [most] likely has a disability that will last over the next 6-12 months and should improve with her plan for rehabilitation." (Tr. 244-46.)

On May 23, 2007, Bowen saw Edie Daniel-Rice, RN, FNP, at the clinic. She was having constant pain in her legs, left arm, and right hand. A review of her systems showed Bowen had joint and muscle pain, with weakness and numbness. She also experienced insomnia and a depressed mood. A physical exam showed Bowen was obese with a waddling gait, but stable. Nurse Daniel-Rice diagnosed her with stomach inflammation, joint pain, degenerative joint disease of the knees, and depression. She prescribed Ranitidine, Celexa, and Ultram.[6] (Tr. 266.)

On June 28, 2007, Bowen saw Nurse Daniel-Rice at the clinic, complaining of right knee pain. The pain was constant, and 7/10 to 10/10. A review of her symptoms showed Bowen had joint and muscle pain, with stiffness, weakness, and numbness. Daniel-Rice diagnosed her with

_____

[5]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

[6]Celexa is used to treat depression. Ultram is used to relieve moderate pain. WebMD, http://www.webmd.com/drugs (last visited June 9, 2010).

arthritis in her knee, controlled depression, and gastroesophageal reflux disease (GERD). She prescribed Ranitidine, Celexa, and Ultram. (Tr. 265.)

On July 23, 2007, Bowen saw Carl Kruse, M.D., at the Mark Twain Counseling Center. Bowen had a history of depression, but had not been seen by a psychiatrist or psychiatric nurse practitioner in several years. However, she was seeing a counselor and taking Celexa. Bowen was stressed about her finances, and had a difficult relationship with her two teenage daughters. Bowen had previously taken Paxil and Zoloft, but stopped taking them because they made her sleepy.[7] She did not think the Celexa was helping her depression. She also took Zantac, and six dosages of Tramadol each day. Bowen reported no problems with her blood pressure or breathing. She had seasonal allergies and a smoker's cough, but nothing worse. A mental status examination showed Bowen was alert and oriented. She was talkative, with tangential thought process, and fair hygiene. She denied any thoughts of harming herself, but had a history of assaultive behavior. She had recently grabbed her daughter by the hair. She complained of racing thoughts, difficulty sleeping, depression, hyperactivity, short-term memory decrease, and a need to write everything down. Her energy levels fluctuated, and she experienced anxiety and panic attacks. She got paranoid at times, and would isolate herself from others unless she absolutely had to be in public. She was willing to take a mood stabilizer to alleviate her mood swings, severe agitation, and impulsiveness. Her affect was irritable and her mood was depressed. She was extremely talkative, and her speech was tangential in nature. Dr. Kruse diagnosed her with depression, but ruled out bipolar disorder because of no obvious symptoms. He assigned her a GAF score of 50, prescribed Geodon, and continued her on Celexa. (Tr. 255-56.)

On August 20, 2007, Bowen saw Sandy Nolan, R.N., C.S., and Dr. Kruse. She had no energy, but was able to find pleasure in some things.

---

[7]Zoloft is used to treat depression. Paxil is used to treat depression, panic attacks, obsessive-compulsive disorder, anxiety disorders, and post-traumatic stress disorder. WebMD, http://www.webmd.com/drugs (last visited June 9, 2010).

Her mood was not too bad, but her sleep was sporadic.  The counselor was leaving soon.  A mental status examination showed Bowen was abnormal for activity level, cognition, and suicidal and homicidal ideation.  Dr. Kruse discontinued Bowen's prescription of Geodon, and assigned her a GAF score of 50.[8]  (Tr. 254.)

On September 17, 2007, Bowen saw Sandy Nolan and Dr. Kruse.  Her appearance, behavior, speech, affect, and thought process were all normal.  Her activity level was restless.  Dr. Kruse assigned her a GAF score of 52.  (Tr. 253.)

On October 9, 2007, Bowen left a message with the Community Health Center, noting she could not afford to see an orthopedic surgeon.  (Tr. 264.)

On November 20, 2007, Bowen saw Sandy Nolan and Dr. Kruse.  She was looking forward to Thanksgiving.  She had no anger issues, her appetite and sleep were good, and she reported no side effects from her medicine. She had no aggression, no psychosis, and a normal behavior and appearance.[9]  She had poor motivation at times, and her affect was half-good, half-bad.  Dr. Kruse had her continue on her Celexa and Clonazepam, and assigned her a GAF score of 50.  (Tr. 251.)

On January 24, 2008, Bowen saw Sandy Nolan.  Her daughter had recently been given six months probation.  Her appetite was good, her sleep was fair, and the medicine was fairly effective with no side effects.  She had good hygiene, no psychosis, and no sign of aggression. Her speech was talkative, but her affect was irritated.  Nolan

---

[8]Geodon is used to treat certain mental or mood disorders, such as schizophrenia or manic episodes associated with bipolar disorder. WebMD, http://www.webmd.com/drugs (last visited June 9, 2010).

On the GAF scale, a score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job).  Diagnostic and Statistical Manual of Mental Disorders, 32-34.

[9]Psychosis is a mental disorder causing gross distortion or disorganization of a person's mental capacity, affective response, and capacity to recognize reality, communicate, and relate to others.  The disorder interferes with the individual's capacity to cope with ordinary demands of everyday life.  Stedman's Medical Dictionary, 1286.

recommended a higher dosage of Klonopin and Celexa, and assigned Bowen a GAF score of 48.[10] (Tr. 249.)

On February 14, 2008, Bowen saw Nurse Nolan at the Mark Twain Area Counseling Center. Bowen reported doing better. Her appetite and sleep were good, and her medicine was being effective without any side effects. She had no aggression, no psychosis, and no risk of suicide. Her affect was euthymic, she had fair insight and judgment, and had no delusions.[11] She was assigned a GAF score of 48. (Tr. 248.)

On March 13, 2008, Nurse Daniel-Rice completed a medical source statement of Bowen's ability to do physical work-related activities. According to Daniel-Rice, Bowen was limited to lifting less than ten pounds and standing and/or walking for less than two hours in an eight-hour workday. She needed to alternate between sitting and standing to relieve pain and discomfort. She could never climb, kneel, crouch, crawl, or stoop. Her knees were swollen, she had decreased range of motion, and she walked with a waddling gait. Daniel-Rice noted that Bowen's condition had lasted or would last for twelve continuous months. (Tr. 258-61.)

On March 19, 2008, Bowen saw Mark Tucker, D.O., to start treatment on her bipolar disorder and depression. She complained of insomnia, panic attacks, and panic disorder. She was taking Klonopin, which was not helping her. She also complained of chronic knee pain. An examination showed Bowen was depressed, with high anxiety. Her right knee had crepitus with all range of motion.[12] X-rays of the knee showed severe degenerative changes with loss of joint surface and bone spurs. Dr. Tucker diagnosed her with bipolar disorder, severe degenerative joint disease in each knee, cartilage softening in the right knee, and moderate obesity. (Tr. 276.)

---

[10]Klonopin is used to treat seizure disorders and panic attacks. WebMD, http://www.webmd.com/drugs (last visited June 9, 2010).

[11]Euthymia refers to a state of joyfulness, mental peace, and tranquility. Stedman's Medical Dictionary, 545.

[12]Crepitus, or crepitation, refers to crackling, and can be the noise or vibration produced by rubbing bone or irregular cartilage surfaces together. Stedman's Medical Dictionary, 368.

On March 31, 2008, Dr. Stricker reviewed x-rays of Bowen's right knee. The x-rays showed degenerative joint disease of the right knee, most severe in the lateral compartment, with almost complete joint space narrowing. Dr. Stricker also suspected intra-articular loose bodies in the right knee. (Tr. 277.)

On April 9, 2008, Bowen saw Christopher Bieniek, M.D., at Midwest Orthopedic. A physical examination showed Bowen had tenderness along the joint lines of her right knee, with significant crepitus with motion. She had normal alignment in the knees. Dr. Bieniek diagnosed her with degenerative joint disease. (Tr. 268.) On May 5, 2008, Dr. Bieniek performed a right knee arthroscopy. After the surgery, he diagnosed Bowen with a degenerative tear of the medial and lateral meniscus. (Tr. 269.)

On May 16, 2008, Bowen saw Dr. Tucker. She had recently hurt her eye on her car door, when she had gotten angry, but did not have any vision loss. She was starting to take her Seroquel and seemed to be doing better on that. She wanted a stronger pain medication. A physical examination showed Bowen had a large bruise on her right knee with tenderness over the joint surface area. Her mood and anxiety levels were stable. She was awake, alert, and oriented. Dr. Tucker diagnosed her with ecchymosis of the left eye, bipolar disorder with insomnia and mania predominant, and degenerative joint disease in each knee, with chronic pain.[13] He prescribed Seroquel, Citalopram, Clonazepam, and Hydrocodone (in place of the Tylenol). (Tr. 272.)

On June 16, 2008, Bowen saw Dr. Tucker complaining of knee pain. Dr. Tucker noted that her questions "were quite dramatically abnormal,"

---

[13]Ecchymosis refers to a purplish patch caused by blood passing out of the blood vessels and into the skin. Stedman's Medical Dictionary, 484, 553. Mania is an emotional disorder characterized by euphoria, increased psychomotor activity, rapid speech, flight of idea, decreased need for sleep, distractability, grandiosity, and poor judgment. It usually occurs in bipolar disorder. Id., 919. Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks. Symptoms of bipolar disorder are severe. National Institute of Mental Health, http://www.nimh.nih.gov/health/publications/ bipolar-disorder/complete-index.shtml (last visited February 20, 2010).

and that he could not decide whether her questions were based on her application for disability, or whether her attitude was as bad as she acted. Dr. Tucker believed she might have bipolar disorder. A physical examination showed Bowen had a pain level of 4/10, stiffness in her hands with range of motion, tenderness and crepitus in both knees, and a tender lower back. Dr. Tucker diagnosed her with nicotine dependence, chronic obstructive pulmonary disease (COPD), chronic lower back pain, degenerative joint disease of the knees, untreated bipolar disorder, and peptic ulcer disease. He continued her on Prednisone, Ranitidine, Hydrocodone, and instructed her to stop smoking.[14] He also completed her disability papers. Bowen worried about gaining weight if she stopped smoking. (Tr. 36-37.)

On June 16, 2008, Dr. Tucker completed a medical source statement of Bowen's mental ability to perform work-related activities. According to the statement, Bowen had extreme limitations in her ability to understand, remember, carry out, and make judgments on simple instructions. She had a marked limitation in her ability to understand, remember, carry out, and make judgments on complex instructions.[15] Dr. Tucker did not identify any factors that supported these assessments. He also found Bowen had moderate limitations in her ability to interact appropriately with the public, co-workers, and supervisors. (Tr. 278-80.)

That same day, Dr. Tucker completed a medical source statement of Bowen's physical ability to perform work-related activities. According to the statement, Bowen had the ability to lift and carry twenty pounds occasionally, and ten pounds frequently. She could stand and/or walk for two hours in an eight-hour workday, but needed to alternate sitting

---

[14]Prednisone is a hormone that decreases the immune system's response to various diseases as a way of reducing symptoms such as swelling and allergic-type reactions. WebMD, http://www.webmd.com/drugs (last visited June 9, 2010).

[15]During the hearing, the ALJ noted that Dr. Tucker must have reversed the two situations. As a result, the ALJ had the VE assume that the marked limitations referred to simple instructions, instead of complex instructions. (Tr. 79.)

and standing.  She could never climb, balance, kneel, crouch, crawl, or stoop.  (Tr. 281-84.)

On July 16, 2008, Bowen saw Dr. Tucker, complaining of knee pain and knee locking.  Bowen noted sleeping most of the night on her Seroquel, and that her sleep quality was greatly improved.  A physical examination showed crepitence in her knees, with incomplete extension. X-rays showed joint mice in the left knee capsule, and severe degenerative lipping.[16]  Her pain was 3/10.  Dr. Tucker diagnosed her with bipolar disorder, chronic lower back pain, degenerative joint disease of the left knee, and an improved right knee.  (Tr. 34-35.)

On July 31, 2008, Frank Froman, Ed. D., a clinical psychologist, conducted a mental status evaluation.  At the time of the evaluation, Bowen was taking Celexa, Seroquel, Klonopin, Hydrocodone, and Ranitidine.  Bowen complained that she experienced severe panic attacks, depression, and bipolar disorder.  She had never been hospitalized for any psychological condition, and was not currently receiving any form of therapy or active treatment.  During the evaluation, Bowen spoke in a slightly disdainful manner.  Her ability to relate was just fair, and she appeared to put forth little effort or energy.  At that same time, she maintained good eye contact and was easy to understand.  Bowen reported leaving the candle-making job because "there was a bunch of Mickey Mouse bull crap going on."  Dr. Froman found Bowen showed no homicidal or suicidal ideation.  She did not socialize with anyone.  Dr. Froman believed her IQ was in the average range.  Other testing showed she had moderate depression and moderate anxiety.  Dr. Froman found Bowen suffered from bipolar disorder and depression.  He found her medicine was controlling and helping her depression symptoms, and noted that her biggest problem was not her bipolar disorder, but instead, her feelings of distance that stemmed from the panic disorder and physical ailments.  Dr. Froman concluded that Bowen appeared able to perform one- and two-step assemblies at a competitive rate, and that she was able to adequately relate to co-workers and supervisors, and understand oral and written instructions.  He also believed Bowen would be able to

_____

[16]Lipping is an outgrowth of bone at a joint in a liplike form. Stedman's Medical Dictionary, 886.

understand oral and written instructions, and withstand the stress of physical work.  Dr. Froman diagnosed Bowen with bipolar disorder and panic disorder with agoraphobia.[17]  He also noted that she suffered from obesity, stomach problems, and difficulty with her hands and knees.  He assigned her a GAF score of 50.  Dr. Froman also completed a medical source statement of Bowen's mental ability to perform work-related activities.  He found Bowen had no limitations in understanding, remembering, and implementing simple or complex instructions.  He found she had only mild limitations in interacting with the public, co-workers, and supervisors.  (Tr. 285-94.)

On September 22, 2008, Dr. Bieniek performed left knee arthroscopy. After the operation, Dr. Bieniek diagnosed Bowen with a meniscus tear, grade four chondromalacia of the lateral condole, and grade two chondromalacia of the patella and trochlear groove.[18]  (Tr. 38.)

On October 15, 2008, Bowen saw Dr. Tucker.  She was under tremendous stress because her daughter had been getting in trouble and was in detention for juvenile services.  Bowen was crying continuously and taking the maximum dosage of Celexa.  A physical examination showed Bowen was emotional and overweight.  Dr. Tucker diagnosed her with bipolar disorder with depression, severe family stress, and pain in the middle and lower back.  He prescribed Effexor, Seroquel, and Hydrocodone.[19]  (Tr. 30-31.)

**Testimony at the Hearing**

On June 24, 2008, Bowen testified before the ALJ.  At the time of the hearing, Bowen was living with friends because she had no money.

---

[17]Agoraphobia is an irrational fear of leaving the familiar setting of home, so pervasive that a large number of external life situations are entered into reluctantly or are avoided.  Stedman's Medical Dictionary, 37.

[18]Chondromalacia is the softening of any cartilage.  Stedman's Medical Dictionary, 298.

[19]Effexor is an antidepressant used to treat depression and mood disorders.  WebMD, http://www.webmd.com/drugs (last visited June 9, 2010).

Bowen last worked at Mark Twain Cave, in September 2006, where she made candles and operated a cashier. She had worked there for seven years. Before that, she worked at a convenience store for two years, where she cashiered, but also cleaned and stocked. Bowen was fired from the Mark Twain Cave because she fell asleep on the job. Her medication made her drowsy. (Tr. 39-45.)

Bowen was taking Celexa, Hydrocodone, Klonopin, Seroquel, and Ranitidine. She did not want to take OxyContin because of its addictive qualities. Dr. Tucker and the staff at Mark Twain Mental Health had prescribed the medications. She took the medication "off and on." Bowen saw Sandy Nolan at the mental health center because her therapist had recently left. She had been going to the center for over a year. (Tr. 45-47.)

Bowen was severely bipolar. Some days she might wake up at six in the morning, while other days she would not get up until two in the afternoon. She had seen therapists for her bipolar disorder, but she had never been hospitalized. If she was up, Bowen would wash the dishes and do the laundry, but it took her a while because of her arthritis. She thought she could only lift about twenty pounds, because she could lift twenty pounds at the grocery store. Bowen did her own grocery shopping, and relied on food stamps to pay for it. (Tr. 47-52.)

Bowen did not have any difficulty taking care of her personal needs. When she lived by herself, her daughter helped with chores that she was unable to do. Her daughter now lived with an aunt. Bowen did not participate in any social groups or activities. She did not visit her daughter in Springfield because her driver's license had expired in 1986. Bowen had recently undergone laparoscopic surgery on her right knee, which had reduced the swelling and grinding, and made it easier to move around. She had an appointment with Dr. Bieniek to have her left knee operated on. Bowen wore a brace for her knee, and also used a walker. A friend had given her the walker; a doctor had not prescribed it. Bowen had not taken the walker when she walked to the grocery store the other day. Bowen could be on her feet for fifteen minutes at a time, before she needed to rest. If she was fully reclined, she could sit for hours at a time. (Tr. 52-58.)

- 14 -

Bowen had problems hearing, and experienced ringing in her ears, though the ringing only lasted a few minutes. She had headaches every day, which brought on nausea. She vomited about once a week because of the nausea. She had arthritis in her right shoulder, and in both hands and arms. Dr. Tucker and Dr. Bieniek had diagnosed her with rheumatoid arthritis. She had numbing pain in her lower back, and swelling from her knees to her feet. Her legs swelled every day, and her doctors had recommended she put her legs up when it happened. Bowen had her legs raised about three or four hours a day. (Tr. 58-61.)

Bowen had suffered from depression her entire life. She suffered from crying spells, and about three or four days a week she stayed in bed without bothering to get dressed. She did not have any suicidal thoughts, but felt worthless all the time. She took naps during the day because she had problems sleeping. Her childhood was marked by sexual, physical, and emotional abuse. She had been sexually abused by cousins and uncles from the time she was three until she was fifteen. As an adult, her relationships with men continued to be marked by abuse. She had a scar on her forehead because a boyfriend had smashed a bottle against her face. She also noted that past boyfriends had broken several of her bones. (Tr. 61-65.)

Bowen had panic attacks, which made it difficult to go shopping. Crowds made her uncomfortable. She had anger issues, and might throw things. She had difficulty concentrating and difficulty with authority figures. Bowen had been treated for alcohol abuse in 1996, but was no longer drinking, and could not remember the last time she drank. (Tr. 65-70.)

John F. McGowan testified during the hearing as a vocational expert (VE). He noted that Bowen had previously worked as a cashier checker (DOT 211.462-014). The ALJ had the VE assume that Bowen could lift twenty pounds occasionally, ten pounds frequently, and could stand or walk for at least two hours in an eight-hour workday. The ALJ had the VE further assume that Bowen needed to get up occasionally when sitting, and avoid climbing, kneeling, crouching, crawling, and stooping. The ALJ clarified that if stooping and crouching simply meant standing up and bending at the waist, the hypothetical should include occasional

stooping and crouching. But if crouching meant squatting, and stooping meant anything else, the hypothetical should not include those movements. The VE testified that the convenience store jobs were classified in a number of different ways, but that Bowen could certainly perform a reasonable amount of the jobs. If the ALJ had the VE further assume that Bowen could perform gross finger manipulation, but would have some difficulty with fine manipulation, the VE testified that his answer would change. (Tr. 70-79.)

If the VE accepted that Bowen had marked limitations in her ability to understand, remember, and carry out simple instructions, and make judgements on simple work-related decisions, those limitations would impact Bowen's ability to keep a job. If Bowen had moderate limitations in her ability to interact with the public and co-workers, the VE thought she could still perform work. (Tr. 79-81.)

The VE noted that a GAF score of 40 represented major impairments in several areas, such as work skill, family relations, judgment, thinking, or mood, as well as an inability to work. A GAF score of 50 is the "break even" point, and scores below 50 indicate serious impairments and social occupation. Following a strict interpretation of the GAF scores, Bowen would not be able to work any job. (Tr. 81-89.)

### III.  DECISION OF THE ALJ

On November 7, 2008, the ALJ issued his opinion that plaintiff was not disabled. He began the opinion describing plaintiff's allegations and testimony. Bowen had worked as a waitress, convenience store clerk and cashier, and candle maker. She had also held some temporary jobs, such as Salvation Army bell ringer. She had not performed any substantial gainful activity since September 27, 2006, the alleged onset date. At the time of the hearing, Bowen had been living with friends because she had no money. Her 14-year old daughter was living with an aunt. Bowen had a Medicaid card, and was receiving food stamps. (Tr. 22-23.)

Bowen had injured her right knee in a motorcycle accident twenty years ago, and undergone surgery in 2008. She complained of arthritis,

deformed fingers, and pain in her back, fingers, and right shoulder. She experienced nausea with vomiting, daily headaches, and ringing ears. Bowen also testified to suffering from bipolar disorder, with the medication giving her erratic sleeping habits. Bowen noted sexual abuse as a child, physical abuse from her partners, and a history of alcohol abuse, but not in recent years. (Tr. 23.)

The ALJ found Bowen had a steady work record, but concluded that the evidence was inconsistent with the allegations of disability. Bowen had been hospitalized for pneumonia, rib fractures, and degenerative changes to her left knee, but these hospitalizations occurred before her alleged onset date. During a consultative physical examination with Dr. Leung, Bowen walked with a minimal limp, could get in and out of the chair, and was generally uncooperative. During a consultative psychological examination, Jerry Aamoth noted that Bowen had not received mental health treatment in ten years. He diagnosed her with a GAF score of 60, indicating mild to moderate symptoms. The ALJ also described examinations by Nurse Daniel-Rice, Dr. Carl Kruse, Nurse Nolan, Dr. Mark Tucker, and Frank Froman. After reviewing this evidence, the ALJ concluded that Bowen had the residual functional capacity (RFC) to perform light work. Specifically, he found she had the ability to stand or walk for two hours in an eight-hour workday, occasionally lift up to twenty pounds, and frequently lift up to ten pounds. She could not climb, but she could occasionally kneel, crouch, crawl, or stoop. Based on the testimony of the VE, the ALJ concluded that Bowen could perform her past work as a convenience store clerk. The ALJ did not find that Bowen had persistent GAF scores from 40 to 50, or that she was unable to crawl or crouch. (Tr. 23-26.)

In reaching this decision, the ALJ discounted the opinions by Dr. Tucker and Nurse Daniel-Rice. The ALJ found that Dr. Tucker's assessments were derivative – that they were based on information from other doctors or Bowen's own subjective allegations, rather than his own medical analysis. The ALJ discounted the opinions by Nurse Daniel-Rice because she had only seen Bowen a few times, and because her opinions were not supported by independent x-rays. The ALJ noted that Bowen had only undergone one surgery, had not participated in physical therapy,

did not have any uncontrollable side effects from medication, and did not exhibit any of the signs typically associated with chronic, severe musculoskeletal pain. The ALJ found no prescription for the use of an assistive device. (Tr. 26-27.)

The ALJ found no evidence that Bowen suffered from any nonexertional pain that seriously interfered with her ability to concentrate. The ALJ also found no evidence she suffered from any mental or mood disorder. In reaching this conclusion, the ALJ discounted the opinion of Dr. Tucker because he was not a psychiatrist, and noted that Bowen had only spent seven months at Mark Twain. Mr. Aamoth and Dr. Froman, mental health specialists, had not placed any significant mental limitations on Bowen. Bowen had never been hospitalized for psychiatric reasons, and had never been called suicidal or psychotic. The ALJ found Bowen's allegations of impairments not credible. The ALJ also found Bowen's mental impairments produced no more than a minimal limitation on her ability to do work related activities. (Tr. 27-28.)

At Step One, the ALJ found Bowen had not performed any significant gainful activity since September 27, 2006. At Step Two, the ALJ found Bowen suffered from degenerative joint disease and arthroscopic surgery of the right knee, possible GERD, mild generalized anxiety disorder, and mild depression or bipolar disorder. At Step Three, the ALJ found that none of these impairments satisfied a listing requirement. At Step Four, the ALJ found that Bowen had the RFC to perform light work, and that she could return to her past work as a convenience store clerk. As a result, the ALJ concluded that Bowen was not disabled within the meaning of the Social Security Act. (Tr. 28-29.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the

Commissioner's conclusion." <u>Id.</u>  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. <u>Id.</u> As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. <u>See</u> <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); <u>Pate-Fires</u>, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987) (describing the five-step process); <u>Pate-Fires</u>, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. <u>Pate-Fires</u>, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. <u>Id.</u> Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work.  <u>Id.</u>  The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work.  <u>Id.</u>  If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work.  <u>Id.</u>

In this case, the Commissioner determined that Bowen could perform her past work as a cashier.

## V.  DISCUSSION

Bowen argues the ALJ's decision is not supported by substantial evidence.  First, she argues the ALJ erred by failing to find her physical impairments severe.  Second, she argues the ALJ failed to evaluate the severity of her obesity.  Third, she argues the ALJ failed to properly evaluate her mental impairments.  Fourth, she argues the ALJ failed to properly weigh the medical testimony.  In particular, Bowen argues that the ALJ should have adopted the medical opinions of Dr. Tucker and Nurse Daniel-Rice.  Fifth, she argues the ALJ improperly dismissed the VE's opinion that she was unemployable.  Sixth, Bowen argues that the ALJ failed to give her testimony sufficient credit. Seventh, she argues that this ALJ has a general bias against social security claimants with her characteristics.  As a result, Bowen argues that the case be assigned to a different ALJ if the case is ultimately remanded.  (Doc. 14.)

**Physical Impairments**

The ALJ found Bowen suffered from the physical impairments of degenerative joint disease and possibly GERD.  (Tr. 28.)  By proceeding to Step Three, the ALJ implicitly found that these impairments were severe.  (Id.)  The ALJ did not find that Bowen suffered from rheumatoid arthritis, another connective tissue disease, or any other specific impairment affecting the back, hands, or fingers.  (Tr. 26.) Substantial evidence supports this finding.

At Step Two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment.  Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).  The claimant bears the burden of proving her impairment or combination of impairments is severe, but the burden is not a heavy one, and any doubt concerning whether the showing has been made must be resolved in favor of the claimant.  Id.; Dewald v. Astrue, 590 F. Supp. 2d 1184, 1200 (D.S.D. 2008).  "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard. . . ."  Kirby, 500 F.3d at 707; see also Germany-Johnson v. Comm'r of Soc. Sec., 313 F. App'x 771, 774 (6th Cir. 2008) (per curiam)

("[S]tep-two severity review is used primarily to screen out totally groundless claims.").

An impairment is not severe if it amounts to only a slight abnormality and does not significantly limit the claimant's physical or mental ability to do basic work activities. <u>Kirby</u>, 500 F.3d at 707; 20 C.F.R. § 404.1521(a). Basic work activities concern the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 404.1521(b). Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. <u>Id.</u> The sequential evaluation process terminates at Step Two if the impairment has no more than a <u>minimal</u> effect on the claimant's ability to work. <u>Kirby</u>, 500 F.3d at 707; <u>Hudson v. Bowen</u>, 870 F.2d 1392, 1396 (8th Cir. 1989).

In March 2007, Dr. Leung diagnosed Bowen with arthritis, but noted that she had been uncooperative during the examination. He also estimated her grip and muscle strength to be at least 4/5. (Tr. 241.) Beyond that single examination, no other doctor diagnosed Bowen with arthritis - despite her repeated complaints that she suffered from arthritis. (Tr. 48, 244, 263.) In her Social Security forms, Bowen listed arthritis as one of the primary reasons she was unable to work. (Tr. 89-90, 150.) Yet, neither Dr. Tucker nor Dr. Bieniek ever diagnosed her with arthritis or hand problems. In fact, Dr. Tucker's progress note pages include a list of symptoms that can be circled, among them rheumatoid arthritis. Dr. Tucker never circled rheumatoid arthritis - even when Bowen complained she was "full of arthritis." (Tr. 31, 33, 35, 37, 271, 273.) Dr. Bieniek also never wrote that Bowen suffered from arthritis. (Tr. 38, 268-69.)

Looking to the medical record, substantial evidence supports the ALJ's assessment of Bowen's physical impairments.

**Obesity**

The ALJ did not mention Bowen's obesity in his opinion or in any question to the VE. More to the point, the ALJ found that there were no credible, medically-established non-exertional limitations when he formulated Bowen's RFC. Substantial evidence does not support this aspect of the ALJ's ruling.

In March 2007, Dr. Leung noted that Bowen was obese. (Tr. 241.) In May 2007, Nurse Daniel-Rice observed that Bowen was obese with a waddling gait. (Tr. 266.) In March 2008, Dr. Tucker diagnosed her with moderate obesity. (Tr. 276.) In July 2008, Frank Froman also noted that Bowen suffered from obesity. (Tr. 288.) At that time, Bowen weighed 264 pounds. (Tr. 35.) At her height, Bowen had a body mass index of 38.8 -- well over the number designating obesity. National Institutes of Health, http://www.nhlbisupport.com/bmi/ (last visited June 10, 2010).

Obesity is a non-exertional impairment. Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997). As a result, the ALJ erred when he concluded that Bowen did not have any non-exertional limitations during his analysis of Bowen's RFC. Indeed, Social Security Ruling 02-01p "requires an ALJ to consider the effects of obesity when assessing RFC, including the fact that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." DeWitt v. Astrue, No. 09-3250, 2010 WL 2181759, at *2 (10th Cir. June 2, 2010) (unpublished). The federal regulations require the same thing. When assessing the claimant's RFC, the ALJ "must consider any additional and cumulative effects of obesity. . . ." Hanauer v. Astrue, No. 2:09 CV 30 JCH/MLM, 2010 WL 1687809, at *18 (E.D. Mo. Apr. 7, 2010) (quoting 20 C.F.R., Pt. 404, Subpt. P, App. 1), report and recommendation adopted by, 2010 WL 1691904 (E.D. Mo. Apr. 27, 2010).

The ALJ's failure to explicitly discuss the claimant's obesity does not necessarily require reversal. McNamara v. Astrue, 590 F.3d 607, 611-12 (8th Cir. 2010); Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009). If the ALJ references the claimant's obesity or weight during the hearing or in the opinion, reversal may not be necessary. Heino, 578 F.3d at 881. Likewise, when the medical records and the claimant's

own testimony fail to demonstrate that obesity results in additional work-related limitations, it is not reversible error if the ALJ's opinion failed to specifically discuss a claimant's obesity. McNamara, 590 F.3d at 611-12.

On the one hand, there is no evidence that any of Bowen's doctors ever placed physical limitations on her ability to perform work-related tasks because of her obesity. In addition, Bowen never discussed her obesity during the hearing or in her applications for disability. (Tr. 39-88, 89-92.) On the other hand, the ALJ did not make a single reference to Bowen's obesity during the hearing or in his written decision. In addition, the ALJ's opinion incorrectly stated that Bowen did not suffer from any non-exertional limitations. (Tr. 29.) Under the circumstances, reversal is appropriate. See Burnside v. Apfel, 223 F.3d 840, 844-45 (8th Cir. 2000) (reversing where the ALJ improperly concluded that the claimant had no non-exertional limitation).

On remand, the ALJ shall consider Bowen's obesity in relation to her other impairments and her RFC. See DeWitt, 2010 WL 2181759, at *3.

**Mental Impairments**

The ALJ found Bowen had no restrictions with respect to daily living activities and maintaining social functioning, and no deficiencies of concentration, persistence, or pace. He also found that Bowen had not suffered any episodes of decompensation. As a result, the ALJ concluded that Bowen's mental impairments imposed no more than a minimal limitation on her ability to do work activities. (Tr. 28.)

The ALJ evaluates the severity of mental impairments by gauging their impact on four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. Cuthbert v. Astrue, 303 F. App'x 697, 699 (11th Cir. 2008) (per curiam); 20 C.F.R. § 404.1520a(c)(3). If the ALJ rates the claimant's limitations as "none" or "mild" in the first three areas, and "none" in the fourth area, the ALJ will generally conclude that the claimant's mental impairments are not severe – unless the evidence indicates that there is more than a minimal limitation in the claimant's ability to perform basic work activities. 20 C.F.R.

§ 404.1520a(d)(1). As noted above, basic work activities concern the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 404.1521(b).

In April 2007, Jerry Aamoth, a licensed psychologist, found Bowen depressed and anxious, with racing thoughts and sleep disturbance. She did not show any signs of delusion or hallucination. Aamoth assigned her a GAF score indicating moderate symptoms. (Tr. 244-46.) In July 2007, Dr. Kruse found Bowen depressed, talkative, and irritable. She showed no signs of harming herself, but displayed assaultive behavior. He assigned her a GAF score indicating serious symptoms. (Tr. 255-56.) In November 2008, Dr. Kruse noted Bowen had no anger issues, no aggression, and no psychosis. She had normal behavior, but he assigned her a GAF score indicating serious symptoms. (Tr. 251.) In January and February 2008, Bowen also received GAF scores indicating serious symptoms. (Tr. 248-49.) In May 2008, Dr. Tucker diagnosed her with bipolar disorder and mania. (Tr. 272.) In June, Dr. Tucker noted Bowen was asking questions that were "dramatically abnormal." (Tr. 36.) The next month, Frank Froman, a clinical psychologist, found Bowen had moderate depression and moderate anxiety. At the same time, he believed she could understand instructions and withstand the stress of physical work. He found she only had mild limitations in interacting with others, and no limitations in understanding instructions. (Tr. 285-94.) In October, Dr. Tucker noted that Bowen was crying continuously. (Tr. 30.) Bowen's pharmacy records for 2004 to 2008 show she was taking medication to treat panic attacks, depression, and bipolar disorder. (Tr. 195-99.)

On the one hand, Bowen never showed any signs of hurting herself. She had no psychosis and no episodes of decompensation. She was never hospitalized for issues relating to mental health. In her function report, she indicated she was able to follow instructions and get along with others. She also noted spending lots of time with friends. (Tr. 170-72.) Frank Froman reached a similar conclusion. On the other hand, Bowen was consistently diagnosed with bipolar disorder and depression, and prescribed medication to combat these impairments. She also received a number of GAF scores indicating serious symptoms. See Pate-

<u>Fires</u>, 564 F.3d at 944 (noting the seriousness of a GAF score of 50 or below).  In addition, Dr. Froman diagnosed Bowen with panic disorder with agoraphobia.

Under the circumstances, the ALJ should not have found that Bowen's mental impairments had no more than a minimal effect on her ability to work.  The record is uniformly to the contrary.  The ALJ erred by finding Bowen's impairments were not severe at Step Two.  On remand, the ALJ should proceed past a Step-Two analysis of Bowen's mental impairments.

**Weighing Medical Testimony**

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1219 (8th Cir. 2001).  The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole.  <u>Id.</u>  Normally, the opinion of the treating physician is entitled to substantial weight. <u>Casey v. Astrue</u>, 503 F.3d 687, 691 (8th Cir. 2007).  The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight.  <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th Cir. 2000).

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data.  <u>Casey</u>, 503 F.3d at 691.  The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent.  <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 803 (8th Cir. 2005); <u>Cantrell v. Apfel</u>, 231 F.3d 1104, 1107 (8th Cir. 2000).  In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations.  <u>Casey</u>, 503 F.3d at 692.

In this case, the ALJ discounted the medical source statements by Dr. Tucker and Nurse Daniel-Rice.  (Tr. 26.)  Substantial evidence supports this decision.

Nurse Practitioner Daniel-Rice was not a treating physician whose opinions could establish a medically determinable impairment. Under the regulations, evidence from acceptable medical sources is necessary to prove a claimant suffers from a medically determinable impairment. Crowder v. Astrue, No. 4:08 CV 1603 FRB, 2010 WL 559131, at *7 (E.D. Mo. Feb. 10, 2010) (citing 20 C.F.R. § 416.913(a)). Acceptable medical sources include licensed physicians, licensed or certified psychologists, and licensed or certified individuals performing the functions of a school psychologist in a school setting. Id. Information from "other sources" such as nurse practitioners and physicians' assistants, may be used to show the severity of an impairment or how the impairment affects a claimant's ability to work, but it cannot be used to establish the existence of a medically determinable impairment. Id. In addition, Nurse Daniel-Rice only saw Bowen twice, and completed the medical source statement nearly nine months after her most recent examination of Bowen. The ALJ properly discounted the medical source statement of Daniel-Rice.

The ALJ properly discounted the mental medical source statement by Dr. Tucker. Frank Froman, a licensed psychologist, found that Bowen could understand oral and written instructions, and withstand the stress of physical work. Dr. Tucker, however, found that Bowen had an extreme limitation in her ability to understand and carry out simple instructions. The ALJ may credit the opinion of a specialist over the opinion of a general treating source. See Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) (noting the "Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). In addition, Dr. Tucker showed little care in completing the statement, finding Bowen had an extreme limitation in understanding and implementing simple instructions, but only a marked limitation in understanding and implementing complex instructions. The ALJ properly discounted the mental medical source statement by Dr. Tucker.

The ALJ also properly discounted the physical medical source statement by Dr. Tucker. In the statement, Dr. Tucker found Bowen had

limited upper extremity strength, and could never crouch, kneel, balance, or stoop. He also found she had limited ability to reach, finger, and feel objects. Yet, Dr. Tucker never imposed any such limitations on Bowen during his examinations. Dr. Tucker never diagnosed Bowen with rheumatoid arthritis or any other hand or upper extremity ailments. Under the circumstances, the ALJ properly discounted the physical source statement as inconsistent with Dr. Tucker's previous examinations. <u>Guilliams</u>, 393 F.3d at 803.

**VE's Testimony**

Bowen argues that the ALJ improperly dismissed the VE's opinion. Because this case will likely require additional VE testimony on remand, this issue is reserved to the ALJ.

**Claimant's Testimony**

Bowen argues that the ALJ failed to give her testimony sufficient credit. Because this case may require an additional hearing, this issue is reserved to the ALJ on remand.

**General Bias**

Bowen argues that this ALJ has a general bias against social security claimants with her characteristics. As a result, she argues that the case be assigned to a different ALJ on remand.

Administrative law judges are presumed to be unbiased, although this presumption can be rebutted by showing a conflict of interest or some other specific reason for disqualification. <u>Rollins v. Massanari</u>, 261 F.3d 853, 857-58 (9th Cir. 2001); <u>Willis v. Astrue</u>, Civil No. 1:08 CV 1069, 2009 WL 3158211, at *3 (W.D. Ark. Sept. 28, 2009). Expressions of annoyance, impatience, dissatisfaction, and even anger, that are within the bounds of what imperfect men and women sometimes display, do not establish bias. <u>Rollins</u>, 261 F.3d at 858. To show bias, the claimant must demonstrate that the ALJ's behavior, in the context of the whole case, "was so extreme as to display [a] clear inability to render fair judgment." <u>Id.</u>

In this case, the ALJ provided Bowen with an hour-long hearing. (Tr. 41-88.)  His questions during the hearing were respectful, and demonstrated a desire to elicit relevant information.  None of the ALJ's comments or questions can be seen as showing bias or being disrespectful to the claimant.  Nothing in the ALJ's written opinion displays a bias against Bowen's claims.   Instead, the hearing and the decision demonstrate that Bowen received a full and fair hearing before the ALJ.  See Smith v. Astrue, Civil Action No. H-07-2229, 2008 WL 4200694, at *5 (S.D. Tex. Sept. 9, 2008) ("This court will not set aside the ALJ's decision based on allegations of generalized bias where the record reflects no particular bias against the claimant and adequately supports the decision.").  There is no evidence the ALJ showed a particular bias to Bowen in this case.

Bowen argues that statistics show that this ALJ exhibits a general bias to denying claims.  Bowen's attorney has raised this statistical argument in the past with respect to this ALJ.  See Martin v. Astrue, No. 2:09 CV 33 JCH/DDN (E.D. Mo. Apr. 16, 2010), report and recommendation adopted by No. 2:09 CV 33 JCH/DDN (E.D. Mo. May 4, 2010). For the reasons stated in the Martin decision, the claim of general bias is unsupported.  This case need not be remanded to a different ALJ.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g).  On remand, the ALJ shall consider Bowen's obesity in relation to her other impairments and her RFC.  The ALJ should also proceed past a Step-Two analysis of Bowen's mental impairments.  An appropriate Judgment Order is issued herewith.


     /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on June 29, 2010.